AO 106 (Rev. 04/10) Application for a Search Warrant

**FILED**

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

AUG 2 8 2019

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

BY_____
DEPUTY CLERK

| | |
|---|---|
| In the Matter of the Search of: | ) |
| | ) |
| Four electronic devices processed into evidence in | ) |
| connection with Suisun City Police Department, | ) |
| Case No. 18-0521, as further described in | ) |
| Attachment A. | ) |
| | ) |

Case No.    2:19 - SW  749 - ___ KJN

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

**See Attachment A, attached hereto and incorporated by reference.**

located in the _____Eastern_____ District of _____California_____, there is now concealed *(identify the person or describe the property to be seized)*:

**See Attachment B, attached hereto and incorporated by reference.**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 1) 18 U.S.C. § 371 | Conspiracy |
| 2) 18 U.S.C. § 844(i) | Malicious Use of Explosive Materials |
| 3) 26 U.S.C. § 5861(d) | Possession of an Unregistered Destructive Device |

The application is based on these facts:

**See Affidavit of ATF Special Agent Daniel J. Bietz, attached hereto and incorporated by reference.**

☒ Continued on the attached sheet.

☐ Delayed notice of __30__ days (give exact ending date if more than 30 _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Daniel J. Bietz, ATF Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____August 28, 2019_____

_____
*Judge's signature*

City and state: _____Sacramento, California_____

Hon. Kendall J. Newman, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41
## FOR A WARRANT TO SEARCH ELECTRONIC DEVICES

I, Daniel J. Bietz, being duly sworn, state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of
        Criminal Procedure for a search warrant authorizing the forensic examination of property
        (i.e., the four electronic devices further described in Attachment A) which is currently in
        law enforcement's possession, and the extraction from that property of the electronically
        stored information within (i.e., the data and information described in Attachment B).

2.      I am a Special Agent with the U.S. Department of Justice, Bureau of Alcohol, Tobacco,
        Firearms and Explosives (ATF).  I have been an ATF Special Agent since May 2016, and I
        am currently assigned to the Sacramento Field Office.  In this role, my responsibilities
        include investigating violations of federal criminal law.

3.      I am a graduate of the Federal Law Enforcement Training Center and the ATF National
        Academy.  While there, I received seven months of training in investigative techniques and
        the enforcement of federal firearms and explosives law.  In addition, I previously served as
        a Combat Engineer with the United States Army and California National Guard.  As a
        Combat Engineer, I gained significant experience in the identification, maintenance, and
        use of firearms and explosives.

4.      Based on my training and experience as an ATF Special Agent, I am familiar with the
        federal laws pertaining to firearms and explosives.  I know that it is unlawful under Title 18
        of the United States Code, Section 844(i), to maliciously damage or destroy, or attempt to
        damage or destroy, by means of fire or an explosive, any building, vehicle, or other real or
        personal property used in interstate or foreign commerce, or in any activity affecting
        interstate or foreign commerce.

5.      I am a "Federal law enforcement officer" as defined in Rule 41(a)(2)(C) of the Federal
        Rules of Criminal Procedure, that is, a government agent engaged in enforcing federal
        criminal laws and authorized to request search and arrest warrants.

6.      The information contained in this Affidavit is based on my review of the reports and files
        in this case, conversations with other law enforcement personnel, and my own personal
        knowledge.

/ / /

7.    Since this affidavit is intended to show only that there is sufficient probable cause for the requested warrant, it does not detail all of my knowledge about this investigation; only that which I believe to be pertinent to the authority requested to search the electronic devices described below.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

8.    The property to be searched consists of the four cellular telephones described below ("the Devices"):

    a.    One black Apple iPhone cellular phone with a shattered screen, with Serial Number FCJTK0XFHG00. This device was located and collected from the center console of Thomas Wayne CAPENHURST's Chevrolet Tahoe on February 19, 2018. This device is designated with FBI evidence number 1829, and is currently located at the Suisun City Police Department, 701 Civic Center Boulevard, Suisun City, CA 94585.

    b.    One black Apple iPhone cell phone, with Serial Number DNPVRTQ9JCL6. This device was located and collected from the glovebox of Thomas Wayne CAPENHURST's Chevrolet Tahoe on February 19, 2018. This device is designated with FBI evidence number 1831, and is currently located at the Suisun City Police Department, 701 Civic Center Boulevard, Suisun City, CA 94585.

    c.    One Sonim cell phone, with IMEI number 014251000509185. This device was located and collected from the center console of Thomas Wayne CAPENHURST's Chevrolet Tahoe on February 19, 2018. This device is designated with FBI evidence number 1832, and is currently located at the Suisun City Police Department, 701 Civic Center Boulevard, Suisun City, CA 94585.

    d.    One Samsung Galaxy S7 cell phone, with IMEI number 358500070415333. This device was located on a couch on the porch at 1105 Maryland Street, Fairfield, CA 94533, on February 19, 2018. This device is designated with ATF evidence number 6, and is currently located at the Federal Bureau of Investigation, 2001 Freedom Way, Roseville, CA 95678.

9.    All four devices were processed into evidence in connection with an investigation initially opened by the Suisun City Police Department (Case # 18-0521). All four devices have been in law enforcement's custody continuously since the time they were seized.

10.   The applied-for warrant would authorize the forensic examination of the Devices for the purpose of identifying electronically-stored data particularly described in Attachment B.

/ / /

**RELEVANT JUDICIAL ACTIVITY IN THE EASTERN DISTRICT OF CALIFORNIA**

11. This case arises from a pipe bomb that was detonated at a family home in Suisun City, California, on February 17, 2018.

12. On March 1, 2018, based on the facts set forth below, I presented a criminal complaint and set of arrest warrants to the Hon. Allison Claire, United States Magistrate Judge, Eastern District of California. The complaint charged defendants Thomas Wayne CAPENHURST and Robert Lee McGRAW with one count of malicious use of explosive materials, in violation of 18 U.S.C. § 844(i), and one count of using a destructive device in furtherance of a federal crime of violence, in violation of 18 U.S.C. § 924(c)(1)(B)(ii). Magistrate Judge Claire signed the complaint and arrest warrants on that day. *See United States v. Thomas Wayne Capenhurst, et al.*, 2:18-mj-0049-AC (E.D. Cal.).

13. On March 15, 2018, a grand jury for the Eastern District of California returned a four-count indictment against the two defendants, charging both men with: (i) conspiracy, in violation of 18 U.S.C. § 371 [Count One]; (ii) malicious use of explosive materials, in violation of 18 U.S.C. § 844(i) [Count Two]; (iii) using a destructive device during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(B)(ii) [Count Three]. The indictment also charged McGRAW with possessing an unregistered destructive device, in violation of 26 U.S.C. § 5861(d) [Count Four]. *See United States v. Thomas Wayne Capenhurst, et al.*, 2:18-cr-0055-KJM (E.D. Cal.).

14. On November 21, 2018, the district court granted CAPENHURST's and McGRAW's separate motions to dismiss Count Three of the indictment as unconstitutionally vague. (*See* Dkt. No. 39, 2:18-cr-0055-KJM (E.D. Cal.).) The government filed a notice of interlocutory appeal the next week, and in August 2019, moved to voluntarily dismiss the appeal in light of the Supreme Court's decision in *United States v. Davis*, No. 18-431. (*See* Dkt. Nos. 40, 51.)

15. After the Ninth Circuit granted the government's voluntary dismissal (of the interlocutory appeal), this case was remanded to the district court for further proceedings. On August 26, 2019, the parties appeared for a status conference and set trial dates for April 2020. (Minutes, Dkt. No. 53.)

**PROBABLE CAUSE**

16. A comprehensive history of this investigation is set out in the affidavit supporting the criminal complaint, filed on March 1, 2018. *See* Dkt. No. 1, *United States v. Thomas Wayne Capenhurst, et al.*, 2:18-cr-0055-KJM (E.D. Cal.). The facts in that sworn affidavit are incorporated here by reference. I add the facts below, as they bear on the request to search the four electronic devices identified in Attachment A.

/ / /

/ / /

*Law enforcement responds to a mid-night explosion in a residential neighborhood.*

17.    On February 17, 2018, at around 12:57 a.m., Suisun City Police Officers were dispatched to the area of Pintail Drive and Blue Jay Drive (in Suisun City, CA) to investigate reports of an explosion. One of the responding officers was flagged down by a neighbor, who said that the loud noise came from 1010 Blue Jay Drive.

18.    As the officer approached 1010 Blue Jay Drive, he saw that the front door had been blown off its hinges and was lying inside the entryway to the home. The officer also saw burn marks on the front porch that appeared consistent with a burn or explosion. The officer also saw pieces of shrapnel lodged in the exterior walls, and windows broken nearby.

19.    David and Christina Capenhurst are renting the home at 1010 Blue Jay Drive. At the time of the explosion, David was in the living room and Christina was in the hallway near the front door. Their three children (ages 14, 11, and 4) were watching television together in one of the bedrooms. The family had just returned home from an evening in the Bay Area about 10-15 minutes before the explosion happened.

20.    When agents interviewed David and Christina about who might have had a motive to harm them, they both identified David's younger brother, Thomas CAPENHURST. David said that CAPENHURST was upset about a child custody dispute concerning CAPENHURST's 14-year old daughter, O.C. David said he was not aware of anyone else who might be responsible for the bombing.

21.    Christina also said that CAPENHURST was the person likely responsible for the explosion. Christina said that she was contacted by the Benicia Police Department several months prior about a child abuse/child neglect investigation involving CAPENHURST's teenage daughter. Christina said she had learned through family members that CAPENHURST was upset at her for "snitching on him."

22.    At around 4:00 a.m., an investigative team from the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) arrived at the home to conduct a post-blast investigation. The team examined the blast site and found fragments from a device consistent with a pipe bomb. The device's casing was a galvanized iron pipe approximately 10 inches long, with a diameter of 1.25 inches. The damage to the front of the home was consistent with a high-pressure wave caused by an explosion and fragmentation, all of which was consistent with an explosion from a pipe bomb-type device.

23.    Shortly afterwards, investigators reviewed CAPENHURST's criminal history and learned that he had been arrested in Napa County in 2009 for possession of a destructive device. (Note: this charge appears to have been dismissed.) Investigators also learned that CAPENHURST was on active probation in Solano County for possession of a firearm. One of his probation conditions required that he submit to a warrantless search of his person and/or property at any time of the day or night, with or without cause. Based on this search condition, officers tried to make contact with CAPENHURST at his home in Dixon, and at his business in Benicia, but they were not able to locate CAPENHURST at that time.

24.     Investigators also learned that CAPENHURST manages a Towing company owned by his
        wife, Tara Capenhurst, at 3101 Bayshore Drive in Benicia, California.  According to his
        probation records, CAPENHURST lives at 1305 Angela Court, Dixon, California.

### Officers review video footage from the security camera at 1010 Blue Jay Drive

25.     The next day (February 18), Sergeant Jose Martinez and I spoke with David and Christina
        Capenhurst once again.  Christina gave us consent to collect the video footage from the
        security system at 1010 Blue Jay Drive.  I reviewed the video footage from night before.

26.     The security video shows that on February 17, at around 12:52 a.m., a person was on foot
        in the front yard at 1010 Blue Jay Drive.  The person was wearing a gray or light colored
        hoodie-style sweatshirt, dark pants, and dark shoes.  It appears that the person had his or
        her face covered.  The person walked between two parked vehicles in the driveway,
        towards the front door, and out of the camera's view.

27.     Seconds later, the video shows a silhouette sprinting away from the house.  The cameras
        are jolted and debris appears to be falling around the front of the house.  A billow of light
        colored smoke is also visible in front of the house.  Shortly after the explosion, a small
        sedan can be seen accelerating away on Bittern Way with its headlights off.

### An anonymous call to law enforcement leads police to two suspects:  Thomas CAPENHURST and Robert McGRAW

28.     On February 19, Solano County emergency services received an anonymous call.  The
        caller said that he had information about the pipe bombing.  The caller provided details that
        had not been released to the public, which included identifying the responsible party as,
        "Thomas," who the caller said works at "Romero Tow."  The caller said that "Thomas" had
        paid another man, who the caller identified as "Robert McGraw," to help with the bombing.
        The caller said that "Thomas" wanted to kill his brother.  The caller also said that they
        ("Thomas" and "Robert") were planning another bombing at an unknown address in
        Vallejo.  The caller said that additional bombs and weapons were being made and stored at
        1105 Maryland Street in Fairfield, California.

29.     Because of the potential threat to public safety, law enforcement set up surveillance at 1105
        Maryland Street immediately.

30.     Further investigation revealed that a man named "Robert McGraw" did, in fact, live at
        1105 Maryland Street.  Within hours, investigators learned that Robert McGRAW (age 20),
        lived at the address with his family (i.e., his mother, father, five brothers, and his oldest
        brother's wife and their two children).  Investigators also learned that Robert McGRAW

and his brother Jacob McGraw (age 18) worked for Thomas CAPENHURST at his tow yard in Benicia.

***Further investigation reveals Thomas CAPENHURST and Robert McGRAW's roles in planning and facilitating the bombing***

31.    On February 19, federal agents interviewed Jacob McGraw in Fairfield.  Jacob provided the following information:

    a.   Jacob McGraw (age 18) currently works for Romero Tow in Benicia, where he does maintenance and helps with painting.  Jacob has worked at the tow shop for a little over a month.  Robert McGRAW (age 20) is Jacob's brother.  Robert McGRAW has worked at Romero Tow for two months.  Thomas CAPENHURST owns Romero Tow.

    b.   Jacob said that one to two weeks before the pipe bombing, he noticed that Robert McGRAW was bringing firearms to their home at 1105 Maryland Street in Fairfield. Jacob saw the firearms in McGRAW's bedroom.  Jacob said that McGRAW had a black AR-15-style rifle, two shotguns, a black .357 revolver, and two-to-three pipe bombs.  Jacob said that Robert McGRAW loves guns.

    c.   Jacob said that after he had been working at Romero Tow for about a week, Thomas CAPENHURST approached he and Robert McGRAW together.  CAPENHURST offered to pay Jacob and Robert McGRAW $10,000 each to place pipe bombs at his brother's home in Suisun and at an unknown apartment in Vallejo, California.  Jacob says he told CAPENHURST that he didn't want anything to do with the offer. Jacob says that CAPENHURST told him that the Suisun address belonged to his brother, and that CAPENHURST said that he was having a problem with his brother over his [CAPENHURST's] daughter.  Jacob said that CAPENHURST makes the pipe bombs himself at the tow yard.

    d.   Jacob did not know CAPENHURST before working at the tow yard, but he says that CAPENHURST knows his [Jacob's] entire family, and that CAPENHURST and Robert McGRAW were already talking about planting pipe bombs before Jacob began working at Romero Tow.

    e.   Jacob says that on February 16, (the night before the bombing), he drove home from work with Robert McGRAW in Robert's red Honda Civic, and that when they arrived home at around 7:00 p.m., he saw Robert McGRAW remove a grey zip-up jacket from the car.  Jacob says that when McGRAW pulled the jacket from the car, it "made a clanking sound."  Jacob asked what Robert McGRAW had wrapped in the jacket, and Robert showed him three pipe bombs.  Jacob did not know when McGRAW put the pipe bombs in the car.

    f.   Later that night, Jacob says that Robert McGRAW woke him up at around 1:20-1:30 a.m.  Robert appeared worried and was talking fast.  McGRAW told Jacob that he had set off one of the pipe bombs in Suisun City.  McGRAW set the pipe bomb on the front

doorstep, lit the fuse, banged on the door "very hard," and then took off running. Jacob did not know if Robert went by himself or not. At the time of this conversation, Jacob says that Robert McGRAW was wearing a red jacket and gray sweats.

g. Robert McGRAW asked Jacob if he would go with him to set off another pipe bomb in Vallejo at an unknown apartment complex, and Jacob declined. During the interview, Jacob said he believes CAPENHURST is responsible for setting off the pipe bombs, as he is paying people to do work for him. Jacob described CAPENHURST as a person who gets what he wants, and is willing to pay for it.

h. Jacob said that CAPENHURST told him that he [CAPENHURST] had tested one of the pipe bombs at the tow yard inside a "white trash trailer" and that it blew the doors open causing damage. The pipe bomb was tested to make sure they would be operable before placing them. Jacob said that he saw this damage when he arrived to work on the morning of February 16, 2018, and he believed the "test bombing" happened that same morning. Jacob did not know whether anyone other than CAPENHURST had a role in making the pipe bombs.

i. Jacob said that CAPENHURST uses large fireworks to make the pipe bombs, and that he has seen CAPENHURST cutting open large fireworks 1.25 inches in diameter and 12 inches in length. He said that CAPENHURST removes the powder inside the fireworks to use in the pipe bombs. Jacob has seen approximately ten boxes full of these type of fireworks at Romero Tow.

j. Jacob was unsure if McGRAW had been paid, but he noted that Robert is now driving around in CAPENHURST's Kia Rio that CAPENHURST was selling for $6,500.

### Law enforcement finds and seizes two pipe bombs during a search at 1105 Maryland Street

32. After Jacob McGraw was interviewed, law enforcement used the information he provided to obtain a search warrant for the premises at 1105 Maryland Street. The property had two separate living quarters: the main structure, where all members of the family lived except for Robert McGRAW; and a detached room near the rear of the property, where McGRAW stayed.

33. When agents searched the detached room, they located a wallet with a California ID card for Robert McGRAW inside. ATF Task Force Officer J. Winger found a backpack elsewhere in the room. Two metal pipe bombs were inside the backpack, along with a body armor panel that appeared to be placed there as a protective layer.

34. A second backpack was found in the room. Inside this backpack, agents found several firearm magazines, a semi-automatic handgun, loose ammunition, and a loaded revolver.

35. After the agents had thoroughly searched McGRAW's room, they inspected the property and found a suspicious blue duffel bag covered with body armor in the backyard along the

fence. After agents removed the body armor, they looked inside the duffel bag and found two shotguns and an AR-15-style rifle.

36.     Both of the pipe bombs were rendered safe, and then seized and processed as evidence. All of the firearms and ammunition at 1105 Maryland Street were also collected as evidence. In addition, the search team located several cell phones at 1105 Maryland Street during the search. All of the phones were returned to their respective owners except for one phone that was located on a couch on the front porch. The search team determined that this phone—a Samsung Galaxy S7 cellular telephone, with IMEI number 358500070415333— likely belonged to McGRAW.

### Robert McGRAW admits his role in the bombing during an interview with federal agents

37.     Later that day (February 19), federal agents interviewed Robert McGRAW about his role in the Suisun City bombing. After being advised of his *Miranda* rights, McGRAW provided the following:

   a. Robert McGRAW said that after he had been working at Romero Tow for roughly one month, Thomas CAPENHURST approached him and asked if he would set off pipe bombs at two locations for a couple thousand dollars. The actual dollar amount was not negotiated at the time. McGRAW described himself as the middle man doing a job for CAPENHURST for money. McGRAW said that he agreed to do it.

   b. Robert McGRAW did not get all the details for the proposed bombings at one meeting, but rather, gleaned the instructions from several smaller conversations. During these conversations, CAPENHURST told McGRAW that there was a broken down gold Chevrolet Tahoe at a house on Blue Jay Drive in Suisun City, and that there would also be a white vehicle, possibly a Mercedes, at the home.

   c. McGRAW did not know the person who lived at the Suisun City address, and he was not provided with a description. McGRAW only knew that CAPENHURST had an issue with his daughter who ran away.

   d. McGRAW said that he received the pipe bombs after work on Thursday, February 15, 2018, at around 7:30-8:00 p.m. CAPENHURST told McGRAW that the pipe bombs would be wedged in the rocks in front of McGRAW's car. When he left work that night and went to his car, McGRAW found three pipe bombs in a standard grocery bag wedged in the rocks, where CAPENHURST said they would be. The pipe bombs were three different sizes.

   e. McGRAW said he put the pipe bombs in his car and drove to his house and transferred them into a backpack.

   f. McGRAW said that CAPENHURST wanted him to detonate all three pipe bombs, and that CAPENHURST told him, "try to knock down the house." McGRAW said he did

not know where CAPENHURST made the pipe bombs, and Robert McGRAW denied making them himself.

g.  McGRAW left his house with the pipe bombs late Friday night (2/16) or early Saturday morning (2/17).  McGRAW drove to Blue Jay Drive in Suisun City and passed by the target house (1010 Blue Jay Drive).

h.  McGRAW repeated that he had not been provided with the address and was told to look for a gold Chevrolet Tahoe.  McGRAW said that as he was driving on Blue Jay Drive, he noticed the vehicle he was looking for, so he parked his red Honda Civic nearby.

i.  McGRAW says that he got out of his car and walked to the house.  He could hear someone talking inside and hesitated for a moment.  But then, he placed the pipe bomb on the doorstep.  McGRAW described the device as being about 12 inches long and 1.25 inches in diameter.  This was the largest of the three pipe bombs.  It had two metal caps with a green fuse sticking out the middle of one of the end caps.

j.  McGRAW says that he lit the pipe bomb with a lighter and then ran away so he would not blow himself up.  McGRAW said that he ran back to his car and drove away (with the headlights off) eastbound on Bittern Way.  McGRAW said he was by himself in his car.

k.  McGRAW said he was wearing a dark gray zip-up hooded jacket, black ski mask, dark blue pants, black Nikes with a small bit of white trim on them, and black latex gloves. McGRAW said that he burned most of his clothing on the side of the road the next day, but that he could not remember where.  McGRAW said that he threw the latex gloves out the window while he was driving home, but that the ski mask should still be in the backpack.  He said that the shoes were still in his bedroom, and the dark gray jacket was in his car.

l.  McGRAW said that his brother Jacob McGraw was not present during the meeting with CAPENHURST when they discussed the pipe bombing plan.  McGRAW said that he would not have allowed CAPENHURST to ask Jacob to do something like that or he would have fought CAPENHURST on the spot.

m.  McGRAW said that he did not call CAPENHURST after the bombing, but instead notified CAPENHURST in person when he went to work on Saturday morning (February 17).

n.  McGRAW said that he has not received any money since the bombing.  He said that CAPENHURST told him, "I'll get you paid up."

/ / /

/ / /

9

*Law enforcement locates and arrests CAPENHURST later that day*

38.     While agents were executing the search warrant at 1105 Maryland Street, members of the FBI's Solano County Violent Crime Task Force located CAPENHURST at Romero Tow at 3101 Bayshore Road in Benicia. Surveillance units identified CAPENHURST's white Chevy Tahoe and saw him at the tow yard.

39.     At approximately 12:08 p.m., CAPENHURST appeared to be looking out toward the entrance of the tow yard. A white female matching the description of Tara Capenhurst got into the Chevy Tahoe's front passenger seat and CAPENHURST got into the driver's seat. The Tahoe left through the main gate. The vehicle eluded surveillance units. Once surveillance units lost sight of the Tahoe, law enforcement used an emergency ping on a phone number known to be registered to Tara Capenhurst, based on the threat to the community presented by the use of pipe bombs and the apparent plans to use more of them on another target.

40.     When the geolocation data for the phone was received, agents determined that the phone was on the Bay Bridge headed towards San Francisco. The FBI used the ping data and California Highway Patrol (CHP) Air assets and located the Tahoe. The CHP conducted a high risk traffic stop and took CAPENHURST into custody. The vehicle was searched and three cell phones were located. They are described as follows:

      a.     One black Apple iPhone cellular phone with a shattered screen, with Serial Number FCJTK0XFHG00. This device was located and collected from the center console of CAPENHURST's Chevrolet Tahoe on February 18, 2019.

      b.     One black Apple iPhone cell phone, with Serial Number DNPVRTQ9JCL6. This device was located and collected from the glovebox of CAPENHURST's Chevrolet Tahoe on February 18, 2019.

      c.     One Sonim cell phone, with IMEI number 014251000509185. This device was located and collected from the center console of CAPENHURST's Chevrolet Tahoe on February 18, 2019.

*Further investigation following CAPENHURST's and McGRAW's arrests*

41.     On February 19, 2018, members of the Solano County SWAT Team executed a search warrant at Romero Tow at 3101 Bayshore Road. After the initial sweep, agents looked for any explosive devices. During the search, ATF personnel located the trash trailer identified by Jacob McGraw as the one used for the testing of the explosive device. Several bags of trash and other trash items were piled on top of the trailer, but no trash was inside. The inside of the trailer was wet and appeared to have been sprayed out with water recently. Inside the trailer, ATF personnel found damage consistent with an explosion, and the door to the trash trailer was bowed out, also consistent with an explosion from within. ATF personnel also located fragments of a metal pipe. The damage to and the evidence found in the trash trailer were consistent with Jacob McGraw's account of CAPENHURST using the

trailer to test an explosive device.

42.     On February 19, 2018, an FBI SWAT team served a search warrant at CAPENHURST's home at 1305 Angela Court in Dixon. Nothing of note was located or seized.

43.     On February 22, 2018, ATF Senior Financial Investigator Charles Phillips ran a Financial Crimes Enforcement Network (FinCEN) database query on CAPENHURST and his wife, Tara Capenhurst. The query revealed that Tara had withdrawn $10,200 in cash from her bank on January 18, 2018, one month prior to the bombing. This amount combined with statements made by Jacob McGraw suggest that Tara Capenhurst may have prepared payment for the bombing prior to the act itself.

44.     An initial examination of Jacob McGraw's cell phone indicated Robert McGRAW had texted Jacob's cell phone at approximately 1:11 a.m. on the morning of February 17, 2018, several minutes after the bombing. The text contained the word "Successful," which was followed by a symbol that appears to be a hand shown palm facing outward with fingers extended. The symbol appears to represent a "high five."

# # # #

45.     Based on my training and experience, and from what I have learned by consulting other agents, I know that mobile telephones and/or SIM cards:
*   preserve in their memory a history of incoming, outgoing, and missed calls;
*   contain in their memory a telephone book, which allows the user to store numbers and other contact information;
*   contain in their memory text messages sent, received, and drafted by the user;
*   have a voicemail function that allows callers to leave messages when the user does not answer;
*   contain other user-entered files such as "to-do" lists, which can provide evidence of a crime;
*   contain photographic data files, which can be evidence of criminal activity when the user took pictures of evidence of crime.

46.     In addition to these functions, I also know that SIM cards are "smart cards" inside mobile telephones, carrying unique identification numbers, which are capable of storing personal data and preventing operation if removed.

47.     Mobile telephone companies also store the data described in the above-paragraphs on their own servers and associate the data with particular users' mobile telephones. In addition, all of these functions are can be found on a "smart" phone or similar handheld device (such as the devices in Attachment A), as well as evidence of email communications.

48. Because there is probable cause to believe that Robert McGRAW texted his brother Jacob McGraw about the pipe bombing that he participated in on February 17, 2018, in violation of 18 U.S.C. § 844(i), and because investigators found what appeared to be text messages from McGRAW's phone in the immediate aftermath of that pipe bombing, I submit there is probable cause to believe that further information and records relating to this event will be found on McGRAW's cell phone. I also submit that there is probable cause to believe that further information and records relating to CAPENHURST's potential violations of 18 U.S.C. §§ 371 [conspiracy] and 844(i) [malicious use of explosive materials] will be found on all three other devices described in Attachment A, and in particular, will contain evidence of the type described in Attachment B.

49. Based on my training and experience as an ATF Special Agent, I know that individuals who illegally possess firearms and explosive materials often take pictures of them with their phones and store them in their phones and often share images of such weapons and explosives with others. They also commonly have text messages and other communications in their phones regarding such weapons and explosives. I have been involved in several investigations where this was the case. I believe the cellular telephones described in Attachment A are likely to have evidence proving CAPENHURST's and McGRAW's participation—collectively and individually—in the offenses charged in the indictment.

50. The devices listed in Attachment A are currently maintained at the Suisun City Police Department in Suisun City, California, and at the FBI's Sacramento headquarters in Roseville, California. The devices have been in law enforcement's custody since they were seized in February 2018. Based on my training and experience, I know the devices have been stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were when the devices first came into law enforcement's possession.

## TECHNICAL TERMS

51. Based on my training and experience, I use the following technical terms to convey the following meanings:

52. <u>Wireless telephone</u>: A wireless telephone (or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of all calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone

numbers in electronic "address books;" sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading form the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

53.    PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and using computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDSs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

54.    Based on my training, experience, and research, I know that the devices have capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, internet access device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device, who they communicated with, and the content of those communications.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

55.    Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

56.    Forensic evidence. As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

57. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

58. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution"' evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

59. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

60. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

61. Nature of examination. Based on the foregoing, and consistent with Rule 41 (e)(2)(B), the warrant I am applying for would permit the examination of the Device consistent with the warrant. The examination may require authorities to employ techniques, including computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

62. Manner of execution. Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto any premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

14

## CONCLUSION

63.     Based on the foregoing, I submit that this Affidavit supports probable cause for a search warrant authorizing the forensic examination of the devices described in Attachment A, to seek the items described in Attachment B.

64.     I declare under penalty of perjury that the statements above are true and correct to the best of my knowledge and belief.

Daniel J. Bietz
Special Agent
Bureau of Alcohol, Tobacco, Firearms
and Explosives

Sworn to and subscribed before me on August 28, 2019.

Hon. Kendall J. Newman
United States Magistrate Judge

Approved as to form:

Timothy H. Delgado
Assistant United States Attorney

15

**ATTACHMENT A**

Description:

The devices to be searched are as follows:

a. One black Apple iPhone cellular phone with a shattered screen, with Serial Number FCJTK0XFHG00. This device was located and collected from the center console of Thomas Wayne CAPENHURST's Chevrolet Tahoe on February 19, 2018. This device is designated with FBI evidence number 1829, and is currently located at the Suisun City Police Department, 701 Civic Center Boulevard, Suisun City, CA 94585.

b. One black Apple iPhone cell phone, with Serial Number DNPVRTQ9JCL6. This device was located and collected from the glovebox of Thomas Wayne CAPENHURST's Chevrolet Tahoe on February 19, 2018. This device is designated with FBI evidence number 1831, and is currently located at the Suisun City Police Department, 701 Civic Center Boulevard, Suisun City, CA 94585.

c. One Sonim cell phone, with IMEI number 014251000509185. This device was located and collected from the center console of Thomas Wayne CAPENHURST's Chevrolet Tahoe on February 19, 2018. This device is designated with FBI evidence number 1832, and is currently located at the Suisun City Police Department, 701 Civic Center Boulevard, Suisun City, CA 94585.

d. One Samsung Galaxy S7 cell phone, with IMEI number 358500070415333. This device was located on a couch on the porch at 1105 Maryland Street, Fairfield, CA 94533, on February 19, 2018. This device is designated with ATF evidence number 6, and is currently located at the Federal Bureau of Investigation, 2001 Freedom Way, Roseville, CA 95678.

**ATTACHMENT B**

1.      All records on the Devices described in Attachment A that relate to violations of 18 U.S.C. §§ 371 and 844(i), and 26 U.S.C. § 5861(d), and involve Thomas Wayne CAPENHURST, Robert Lee McGRAW, their co-conspirators and associates, including:

   a.     All names, words, telephone numbers, email addresses, time/date information, messages or electronic data in the memory of the mobile telephone or on a server and associated with the mobile telephone and described as:

   i.     Call history (incoming, outgoing, and missed calls);
   ii.    Text messaging history (incoming, outgoing, and drafts);
   iii.   Telephone book (a/k/a "contacts list");
   iv.    Data screen, file, or writing identifying the telephone number associated with the mobile telephone searched;
   v.     Data screen, file, or writing containing serial numbers or other information to identify the mobile phone searched;
   vi.    Voicemail;
   vii.   Photo gallery;
   viii.  User-entered messages (i.e., to-do lists); and
   ix.    Any passwords used to access the electronic data described above.

   b.     Information that may identify criminal co-conspirators, associates, or potential victims, including email addresses, phone numbers, IP addresses, names or contact/ profile information in the Phone Book or Contacts function.

   c.     Information related to sources of instruments of the criminal act such as invoices, receipts, and emails from online retailers.

   d.     Any information related to schedules and travel, including geolocation data and GPS coordinates stored on the Devices.

   e.     Any information related to bank records, checks, credit card bills, account information, or other financial records.

2.      Evidence of user attribution showing who used or owned the Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

3.      As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including text messages, voicemail messages or voice notes, any form of computer or electronic storage (such as flash memory or other media that can store data), videos, and any photographic form.

# # # #

17

AO 93 (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

| | |
|---|---|
| In the Matter of the Search of: | ) |
| | ) |
| Four electronic devices processed into evidence in | ) |
| connection with Suisun City Police Department, Case No. | ) |
| 18-0521, as further described in Attachment A. | ) |
| | ) |

Case No. 2:19-SW 749-ᅳKJN

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____EASTERN_____ District of _____CALIFORNIA_____
*(identify the person or describe the property to be searched and give its location)*:

**See Attachment A, attached hereto and incorporated by reference.**

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

**See Attachment B, attached hereto and incorporated by reference.**

**YOU ARE COMMANDED** to execute this warrant on or before _____September 11, 2019_____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to: __any authorized U.S. Magistrate Judge in the Eastern District of California.__

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for __30__ days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:   Aug 28, 2019   9:50 A.M.

City and state:      Sacramento, California

Judge's Signature

Hon. Kendall J. Newman, U.S. Magistrate Judge
*Printed name and title*

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2) (modified)

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

| Certification |
|---|

I swear that this inventory is a true and detailed account of the person or property taken by me on the warrant.

_____

Subscribed, sworn to, and returned before me this date.

_____          _____
Signature of Judge                                              Date

## ATTACHMENT A

Description:

      The devices to be searched are as follows:

      a.  One black Apple iPhone cellular phone with a shattered screen, with Serial Number FCJTK0XFHG00.  This device was located and collected from the center console of Thomas Wayne CAPENHURST's Chevrolet Tahoe on February 19, 2018.  This device is designated with FBI evidence number 1829, and is currently located at the Suisun City Police Department, 701 Civic Center Boulevard, Suisun City, CA 94585.

      b.  One black Apple iPhone cell phone, with Serial Number DNPVRTQ9JCL6.  This device was located and collected from the glovebox of Thomas Wayne CAPENHURST's Chevrolet Tahoe on February 19, 2018.  This device is designated with FBI evidence number 1831, and is currently located at the Suisun City Police Department, 701 Civic Center Boulevard, Suisun City, CA 94585.

      c.  One Sonim cell phone, with IMEI number 014251000509185.  This device was located and collected from the center console of Thomas Wayne CAPENHURST's Chevrolet Tahoe on February 19, 2018.  This device is designated with FBI evidence number 1832, and is currently located at the Suisun City Police Department, 701 Civic Center Boulevard, Suisun City, CA 94585.

      d.  One Samsung Galaxy S7 cell phone, with IMEI number 358500070415333.  This device was located on a couch on the porch at 1105 Maryland Street, Fairfield, CA 94533, on February 19, 2018.  This device is designated with ATF evidence number 6, and is currently located at the Federal Bureau of Investigation, 2001 Freedom Way, Roseville, CA 95678.

16

**ATTACHMENT B**

1.    All records on the Devices described in Attachment A that relate to violations of 18 U.S.C. §§ 371 and 844(i), and 26 U.S.C. § 5861(d), and involve Thomas Wayne CAPENHURST, Robert Lee McGRAW, their co-conspirators and associates, including:

    a.    All names, words, telephone numbers, email addresses, time/date information, messages or electronic data in the memory of the mobile telephone or on a server and associated with the mobile telephone and described as:

        i.      Call history (incoming, outgoing, and missed calls);
        ii.     Text messaging history (incoming, outgoing, and drafts);
        iii.    Telephone book (a/k/a "contacts list");
        iv.    Data screen, file, or writing identifying the telephone number associated with the mobile telephone searched;
        v.      Data screen, file, or writing containing serial numbers or other information to identify the mobile phone searched;
        vi.     Voicemail;
        vii.    Photo gallery;
        viii.   User-entered messages (i.e., to-do lists); and
        ix.     Any passwords used to access the electronic data described above.

    b.    Information that may identify criminal co-conspirators, associates, or potential victims, including email addresses, phone numbers, IP addresses, names or contact/ profile information in the Phone Book or Contacts function.

    c.    Information related to sources of instruments of the criminal act such as invoices, receipts, and emails from online retailers.

    d.    Any information related to schedules and travel, including geolocation data and GPS coordinates stored on the Devices.

    e.    Any information related to bank records, checks, credit card bills, account information, or other financial records.

2.    Evidence of user attribution showing who used or owned the Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

3.    As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including text messages, voicemail messages or voice notes, any form of computer or electronic storage (such as flash memory or other media that can store data), videos, and any photographic form.

# # # #